UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
VNB REALTY, INC.,                       :
                          Plaintiff,    :
             -v-                        :      11 Civ. 6805 (DLC)
                                        :
BANK OF AMERICA CORPORATION, et al.,    :      OPINION & ORDER
                          Defendants.   :
                                        :
----------------------------------------X

APPEARANCES:

For the plaintiff:

Peter N. Tsapatsaris
PETER N. TSAPATSARIS LLC
200 East 33rd Street
27th Floor, Suite D
New York, NY 10016

Talcott J. Franklin
TALCOTT FRANKLIN P.C.
208 North Market Street
Suite 200
Dallas, TX 75202

For the defendants:

Meredith E. Kotler
Elizabeth Vicens
James W. Doggett
Catherine C. Gordley
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006

DENISE COTE, District Judge:

    Before the Court is defendants' January 18, 2013 motion to

dismiss.  For the following reasons, the motion is granted.

BACKGROUND

This case concerns the purchase by plaintiff VNB Realty, Inc. ("VNB"), a real estate investment trust, of Residential Mortgage Backed Securities ("RMBS") from the defendants. The Amended Complaint ("FAC") explains that the "genesis" of this case was the filing by the Federal Housing Finance Agency ("FHFA") of a suit against these defendants in connection with the purchase by Fannie Mae and Freddie Mac (collectively, the "GSEs") of certificates like those purchased by VNB. See FHFA v. Bank of America Corp., et al., No. 11 Civ. 6195 (DLC) (the "FHFA action"). That case is one of seventeen actions filed by FHFA in this district and coordinated before this Court, of which thirteen currently remain unresolved.[1]

---

[1] The original seventeen cases are: FHFA v. UBS Americas, Inc., et al., 11 Civ. 5201 (DLC); FHFA v. JPMorgan Chase & Co., et al., 11 Civ. 6188 (DLC); FHFA v. HSBC North America Holdings, Inc., et al., 11 Civ. 6189 (DLC); FHFA v. Barclays Bank PLC, et al., 11 Civ 6190 (DLC); FHFA v. Deutsche Bank AG, et al., 11 Civ. 6192 (DLC); FHFA v. First Horizon National Corp., et al., 11 Civ 6193 (DLC); FHFA v. Bank of America Corp., et al., 11 Civ. 6195 (DLC); FHFA v. Citigroup Inc., et al., 11 Civ. 6196 (DLC); FHFA v. Goldman, Sachs & Co., et al., 11 Civ. 6198 (DLC); FHFA v. Credit Suisse Holdings (USA), Inc., et al., 11 Civ. 6200 (DLC); FHFA v. Nomura Holding America, Inc., et al., 11 Civ. 6201 (DLC); FHFA v. Merrill Lynch & Co., Inc., et al., 11 Civ. 6202 (DLC); FHFA v. SG Americas, Inc., et al., 11 Civ. 6203 (DLC); FHFA v. Morgan Stanley, et al., 11 Civ. 6739 (DLC); FHFA v. Countrywide Financial Corp., et al., 11 Civ. 6916 (DLC); FHFA v. Ally Financial Inc., et al., 11 Civ. 7010 (DLC); FHFA v. General Electric Co., et al., 11 Civ. 7048 (DLC). FHFA v. Countrywide was transferred to the Central District of California as related to defendant Countrywide's bankruptcy proceedings in that district, and FHFA v. General Electric Co.,

The certificates VNB purchased were issued in connection with one of the twenty-three securitizations at issue in FHFA v. Bank of America.  Unlike in that and other FHFA cases, however, VNB does not assert claims under Section 11 of the Securities Act of 1933.  15 U.S.C. §§ 77k.  Rather, VNB asserts only a fraud claim under the common law of New York.  While six of the FHFA cases also include fraud claims, FHFA v. Bank of America is not one of them.

VNB contends that it purchased RMBS issued from a single securitization: Banc of America Alternative Loan Trust, Series 2006-1 ("BOAA 2006-1").  RMBS are securities entitling the holder to income payments from pools of residential mortgage loans ("Supporting Loan Groups" or "SLGs") that are held by a trust.  For the securities at issue here, the offering process began with a "sponsor," defendant Bank of America, National Association ("BOA National"), which originated the mortgage loans that were to be included in the offering.  The sponsor then transferred a portfolio of loans to a trust that was created specifically for that securitization; this task was accomplished through the involvement of an intermediary known as a "depositor," defendant Banc of America Mortgage Securities, Inc. ("BOA Mortgage").  The trust then issued certificates to

---

FHFA v. Citigroup Inc., and FHFA v. UBS Americas, Inc. have settled.

the underwriter, defendant Banc of America Securities, LLC ("BOA Securities"), which in turn sold them to plaintiff VNB.  All three of these entities were wholly owned subsidiaries of defendant Bank of America Corporation ("BOA Corp.").

The certificates were backed by the underlying mortgages. Thus, their value depended on the ability of mortgagors to repay the loan principal and interest and the adequacy of the collateral in the event of default.  VNB purchased Class 4CB1 certificates.  The certificates purchased by VNB were backed by a different Supporting Loan Group and came from a lower tranche than the certificates purchased by the GSEs but were nevertheless also rated AAA at the time of issuance and purchase.  The certificates were offered pursuant to a shelf registration statement, a prospectus, and a prospectus supplement filed with the Securities and Exchange Commission ("SEC").  These documents together constitute the "Offering Documents" (or "Offering Materials").

VNB filed its complaint on September 28, 2011.  The case was reassigned to this Court as related to the other FHFA actions, and on November 16 the Court issued an Order staying defendants' time to answer or move to dismiss.  Ultimately, the stay of the VNB action remained in place until after the Court's rulings on motions to dismiss in FHFA v. UBS Americas, Inc., No. 11 Civ. 5201 (DLC), a strict liability case, and FHFA v.

JPMorgan Chase & Co., No. 11 Civ. 6188 (DLC), a fraud case.
Thereafter, the parties submitted a stipulated schedule for
amendment of the complaint and briefing on defendants' motion to
dismiss, and on December 19, 2012, VNB filed the FAC.

The FAC asserts that the Offering Documents contained
materially false and misleading statements about the
characteristics of the loans in the Supporting Loan Group.  In
particular, VNB points to four types of representations made in
the Offering Documents that it argues were fraudulent: (1) the
representation that the mortgages were originated in accordance
with BOA National's underwriting guidelines, (2) representations
regarding owner-occupancy rates for the mortgages, (3)
representations regarding the Loan to Value (or "LTV") ratios of
the mortgages, and (4) the accuracy of the credit ratings
assigned to the certificates.  VNB also alleges that the
defendants knew that these representations were false and that
it justifiably relied on them in deciding to purchase the
certificates.  On January 18, defendants filed a motion to
dismiss the Amended Complaint, arguing (1) that large portions
of the FAC should be stricken, (2) that the FAC fails to
adequately allege falsity or scienter with respect to each of
the four types of misrepresentations at issue, (3) that the
FAC's aiding and abetting claim against defendant BOA Corp.

should be dismissed, and (4) that VNB's claim for punitive damages should be stricken.

DISCUSSION

I.  Motion to Strike

Defendants have moved to strike substantial portions of the FAC as improperly importing passages from the complaints in FHFA v. Bank of America, and AIG v. Bank of America Corp., No. 11 Civ. 6212 (LAK) (the "AIG action").  Rule 12(f) allows a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The Second Circuit has observed that "courts should not tamper with the pleadings unless there is a strong reason for so doing," Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976), and has emphasized that Rule 12(f) is "designed for excision of material from a pleading, not for dismissal of claims in their entirety."  Day v. Moscow, 955 F.2d 807, 811 (2d Cir. 1992) (citation omitted).

Historically and in other circuits, Rule 12(f) has been confined to particular factual circumstances not relevant here. The Advisory Committee notes accompanying the original rule indicate that it is an adaptation of Federal Equity Rule 21, which provided that "the court may, upon motion or its own initiative, order any redundant, impertinent, or scandalous

matter stricken out."  Fed. R. Civ. P. 12 advisory committee's note, 1937 adoption, subdivision (f).  Courts have observed that "striking a portion of a pleading is a drastic remedy" and is therefore "disfavored."  Manning v. Boston Medical Center Corp., --- F.3d ---, 2013 WL 3942925, at *20 (1st Cir. 2013) (citation omitted).  "The function of a 12(f) motion to strike" has been seen as "avoid[ing] the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial."  Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 973 (9th Cir. 2010) (citation omitted).

In light of these considerations, there has arisen since the adoption of the rule

> general judicial agreement, as reflected in the
> extensive case law on the subject, that [motions to
> strike under Rule 12(f)] should be denied unless the
> challenged allegations have no possible relation or
> logical connection to the subject matter of the
> controversy and may cause some form of significant
> prejudice to one or more of the parties to the action.

5C Wright & Miller, Federal Practice and Procedure § 1382 (3d ed.); accord United States v. Coney, 689 F.3d 365, 379 (5th Cir. 2012); In re Gitto Global Corp., 422 F.3d 1, 12 (1st Cir. 2005); Talbot v. Robert Matthews Distributing Co., 961 F.2d 654, 664 (7th Cir. 1992).  The term "immaterial" has been understood in this broader context, and has been held to mean "that which has no essential or important relationship to the claim for relief

or the defenses being plead." <u>Whittlestone</u>, 618 F.3d at 974
(citation omitted).

Defendants point to a line of cases in this district for
the proposition that "references to preliminary steps in
litigations and administrative proceedings that did not result
in an adjudication on the merits or legal or permissible
findings of fact are, as a matter of law, immaterial under Rule
12(f)." <u>In re Merrill Lynch & Co., Inc. Research Reports Sec.</u>
<u>Litig.</u>, 218 F.R.D. 76, 78 (S.D.N.Y. 2003).  This rule traces
back to the Second Circuit's opinion in <u>Lipsky</u>, in which the
court affirmed an order striking portions of a complaint that
referenced an SEC complaint that had resulted in a consent
judgment.  <u>See</u> 551 F.2d at 892-4.  District courts have read
<u>Lipsky</u> with varying degrees of breadth.  <u>Compare</u> <u>RSM Prod. Corp.</u>
<u>v. Fridman</u>, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009)
("[P]aragraphs in a complaint that are either based on, or rely
on, complaints in other actions that have been dismissed,
settled, or otherwise not resolved are . . . immaterial
. . . .") <u>with</u> <u>In re Bear Stearns Mortgage Pass-Through</u>
<u>Certificates Litig.</u>, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y.
2012) ("Neither Circuit precedent nor logic supports such an
absolute rule." (discussing <u>RSM</u>)).

A close reading of <u>Lipsky</u> reveals that it does not mandate
the elimination of material from a complaint simply because the

material is copied from another complaint.  <u>Lipsky</u> principally addressed whether a complaint had adequately pleaded that the offering documents filed by the defendants in connection with the plaintiff's shares contained material omissions and misrepresentations.  <u>Lipsky</u>, 551 F.2d at 891.  Instead of discussing its own offering documents, the plaintiff had copied passages from an SEC complaint with allegations about <u>other</u> offering documents.  <u>Id</u>.  While the plaintiff claimed that the sets of documents were "basically duplicates," its pleading had not actually alleged that its own offering documents were defective.  <u>Id</u>.  The Court of Appeals remanded the action to the district court to permit the plaintiff to amend its complaint to allege inadequacies in its own offering documents.  <u>Id</u>. at 844.

Given this context, <u>Lipsky</u>'s discussion of Rule 12(f), and in particular its examination of whether references to other pleadings should be stricken as "immaterial," has limited utility if a plaintiff has adequately identified the material omissions and misstatements in the offering documents relevant to his claim.  As the <u>Lipsky</u> court stressed, its holding was confined to the "facts of this case."  <u>Id</u>. at 893.  It stated, "we hold that neither a complaint nor references to a complaint which results in a consent judgment may properly be cited in the pleadings <u>under the facts of this case</u>."  <u>Id</u>. (emphasis

supplied).[2]  The more general teaching of <u>Lipsky</u>, that "courts
should not tamper with the pleadings unless there is a strong
reason for so doing," <u>id</u>., has broader applicability, as does
its admonition that Rule 12(f) should be "construed strictly
against striking portions of the pleadings on the grounds of
immateriality, and if the motion is granted at all, the
complaint should be pruned with care."  <u>Id</u>. at 894.

    In applying <u>Lipsky</u> to the present case, it is helpful to be
precise about the various ways in which VNB's FAC relies on the
<u>FHFA</u> and <u>AIG</u> complaints.  First, the defendants accuse VNB of
essentially plagiarizing the other two complaints.  In other
words, defendants have pointed out that numerous paragraphs of
the FAC are copied word for word, or with minimal alterations,
from the <u>FHFA</u> and <u>AIG</u> complaints, without any explicit reference
to those complaints.  There is no evidentiary rule against
plagiarism, and each plaintiff is not required to craft anew
elementary background material describing how the securitization
process works, to take but one example.  That VNB's lawyers

---

[2] It is noteworthy that at the same time it affirmed the district
court's order striking the reference to the SEC complaint, the
Court of Appeals observed that it "[q]uite frankly" did not
understand how the elimination harmed the plaintiff, who could
simply identify the deficiencies in his own offering documents
and offer any relevant evidence from the SEC action at his own
trial.  <u>Lipsky</u>, 551 F.2d at 894.

chose to copy the wording used by FHFA's lawyers does not mean that substantial portions of their FAC must be stricken.[3]

Second, the FAC explicitly cites the forensic loan file review performed by FHFA in FHFA v. Bank of America.  In language largely copied verbatim from FHFA's complaint, the FAC reports that the forensic loan file review involved taking a sample of 1,000 randomly selected loans from each Supporting Loan Group and reviewing them to determine whether, for instance, the LTV ratios reported in the Prospectus Supplements were accurate.  The extent to which a review of documents conducted by another plaintiff assists VNB in meeting its burden of pleading the falsity of statements in the offering documents pertinent to VNB's claims will be addressed below, but the description of the FHFA review need not be stricken under Rule 12(f).

Finally, in one particular instance, the FAC cites the AIG complaint as the source of certain factual allegations that apparently originated with confidential witnesses.  To be more specific, paragraph 87 of the FAC begins "According to AIG's well pleaded allegations in [AIG v. Bank of America]" and then, in eight sub-paragraphs, lists various allegations.  The

---

[3] Defendants have moved to strike 61 paragraphs of the 124 paragraph FAC.  Of those, the vast majority make no mention of other complaints and "rely" on them only in the sense that their wording is plagiarized.

allegations contained in the sub-paragraphs are, in turn, copied almost verbatim from five paragraphs of the AIG complaint, which contain allegations attributed to confidential sources.  This portion of the FAC is problematic, relying as it does on confidential sources quoted in another complaint, individuals with whom VNB's counsel obviously has not had direct contact. Any deficiency in this regard, however, must be tested under the standards arising under Rule 9(b), and may not be stricken in advance of that analysis through application of Rule 12(f).

II.  Motion to dismiss

For each of the four types of misrepresentations alleged in the FAC, Bank of America argues that VNB has failed to adequately plead the falsity of the statements or that they were made with the requisite scienter.  In considering a motion to dismiss, a court must "accept as true all allegations in the complaint and draw all reasonable inferences in the plaintiff's favor."  Connecticut v. Am. Elec. Power Co., Inc., 582 F.3d 309, 320 (2d Cir. 2009), rev'd on other grounds, 131 S. Ct. 2527 (2011).  The elements of fraud under New York law are (1) a material misrepresentation of a fact, (2) scienter, (3) justifiable reliance by the plaintiff, and (4) damages.  City of New York v. Smokes-Spirits.Com, Inc., 541 F.3d 425, 454 (2d Cir. 2008), rev'd on other grounds sub nom. Hemi Group, LLC v. City of New York, 130 S. Ct. 983 (2010).  Allegations of fraud must

satisfy Rule 9(b), Fed. R. Civ. P., which requires that a plaintiff "state with particularity the circumstances constituting fraud."  Rule 9(b) thus requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  "Allegations that are conclusory or unsupported by factual assertions are insufficient."  Id.

Rule 9(b) also requires that a complaint plead "facts that give rise to a strong inference of fraudulent intent," a burden that can be satisfied "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006).  A complaint presents the requisite strong inference of fraudulent intent where it alleges that the defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor."  Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000).

13

a. Compliance with underwriting guidelines

The FAC alleges that the offering documents made false statements regarding the origination of the loans in the Supporting Loan Group.  In particular, the FAC quotes the Prospectus Supplement as representing that "[a]ll of the mortgage loans were originated by the sponsor under either the sponsor's general underwriting standards or the 'Alternative A' underwriting standards."[4]  The Prospectus indicated that Bank of America's underwriting guidelines were "intended to evaluate the mortgagor's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  The portions of the Prospectus quoted in the FAC described in detail the types of documentation required to verify data provided by the applicant, particularly income and assets.  The Prospectus also described various programs under which less documentation might be required from borrowers who met certain additional requirements.  For instance, under the "'Stated Income, Stated Asset' documentation program," borrowers were not required to provide verification of income or assets if they met a certain LTV ratio and credit score.  In general, the underwriting

---

[4] So-called "Alt-A" mortgages are "a step above subprime," and while they are "not susceptible to a single definition," they "generally are larger in size than subprime loans and have a significantly higher credit quality."  Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Investment Management Inc., 712 F.3d 705, 712, 715 (2d Cir. 2013).

guidelines required the consideration of LTV ratio, debt-to-income ratio, credit history, employment, occupancy, type of property, and purpose of the loan.

The FAC alleges that the underwriting guidelines were "systemically ignored."  "[V]arious investigations into originators' underwriting practices by government officials and private litigants," the FAC says, "revealed widespread abandonment of originators' reported underwriting guidelines during the relevant period."  The FAC then alleges that defendants in particular "ignored borrowers' actual repayment ability and the value and adequacy of mortgaged property used as collateral" and granted "systematic, bulk exceptions to underwriting standards . . . without consideration of any compensating factors."

The FAC advances four basic forms of factual support for these allegations.  First, the FAC points to allegations made by AIG in its complaint in the AIG action regarding Bank of America's adherence to underwriting guidelines.  According to AIG, the FAC says, Bank of America used various tactics to approve loans that would not otherwise meet its underwriting guidelines.  For instance, the FAC alleges that loans rejected by defendants' automated system would be referred for manual underwriting and approved as "exceptions."  The FAC also alleges that "credit-blemished" loans were referred to a special group

15

that had a "mandate" to find ways to approve the loans despite the fact that they had been rejected under the underwriting guidelines.  Finally, the FAC alleges that Bank of America knew that borrowers who used the stated income program were lying about their income.

Second, the FAC points to the dramatic downgrade in the credit ratings of the certificates, which were rated AAA at the time they were sold and Caa3 at the time the FAC was filed.  The FAC alleges that the ratings downgrade "revealed the mortgage loans' true value and credit quality."

Third, the FAC cites the high default rate of the mortgages in the Supporting Loan Group, which the FAC suggests is indicative of the poor underwriting standards used to originate the loans.  In making this allegation, the FAC reports that the certificates purchased by VNB have performed "even worse" than those at issue in the FHFA action, and presents foreclosure and delinquency data for the loans at issue in the two cases.

Finally, the FAC cites as factual support certain information regarding Clayton Holdings, Inc. ("Clayton"), a third-party due diligence provider.  The FAC quotes an article from the New York Times reporting that Clayton had informed the Attorney General of New York that there was a "significant deterioration of lending standards" beginning in 2005 and that, in order to meet demand, "some investment banks directed Clayton

to halve the sample of loans it evaluated in each portfolio."
The FAC also cites Clayton's "trending reports," which show that
it rejected 30% of the loans defendants submitted for review, of
which 27% were eventually waived into loan pools.

There is a serious deficiency with the first of these four
forms of factual support.  The material that appears in
paragraph 87 of the FAC, which begins "According to AIG's well
pleaded allegations" and then simply copies, in eight sub-
paragraphs, allegations from the AIG complaint, must be
disregarded.  While much of the material in paragraph 87 of the
FAC is repeated with minimal or no alterations, there is one
crucial difference: AIG's complaint begins by explaining that
the allegations can be attributed to "confidential witnesses
interviewed by AIG prior to the filing of this complaint."
VNB's FAC removes this passage, studiously avoiding all mention
of confidential witnesses.[5]  In another example, where AIG's
complaint reported that "in the words of a former Mortgage
Underwriter with Bank of America from 2005 to 2006, Bank of
America and its employees would do 'whatever they could do to
make loans,'" VNB's FAC removed the first clause and copied the
remainder word for word, alleging that "Bank of America and its
employees would do 'whatever they could do to make loans.'"

---

[5] The lone exception is an allegation that "one former Bank of
America employee" believed that certain loans "should not have
been funded under any circumstances."

17

While plaintiffs are not required to name confidential witnesses, they are required under the Private Securities Litigation Reform Act ("PSLRA") to describe them "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novak, 216 F.3d at 314.  The PSLRA does not apply to this case, but Rule 9(b) nevertheless "has long required plaintiffs in securities fraud cases to state 'the circumstances constituting fraud . . . with particularity.'" Id. at 312.  By drawing its factual allegations from the statements of confidential witnesses in AIG's complaint, VNB is attempting to rely on the substance of those allegations without being held responsible for certifying that they are supported by some factual basis, or at least that the witnesses did in fact make such statements.  Unlike AIG, VNB presumably does not even know who these witnesses are.  See Stichting Pensioenfonds ABP v. Merrill Lynch & Co., Inc., No. 10 Civ. 6637 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013).  Such reliance is impermissible, particularly in light of counsel's "personal, non-delegable responsibility" under Rule 11 to "validate the truth and legal reasonableness of the papers filed." Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120, 126 (1989); see also Stichting, 2013 WL 3989066, at *4 ("Allowing counsel to rely on confidential witness statements recounted in a separate

complaint would provide the Court little assurance that the factual contentions have any evidentiary support.").[6]

Moreover, VNB frequently removed references to the confidential witnesses, turning those allegations into conclusory, generalized assertions which are entitled to no weight when addressing the adequacy of pleadings.  See ATSI, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient.").  For example, the naked allegation that "Bank of America and its employees would do whatever they could do to make loans," must be disregarded as argumentative rather than factual.

VNB argues that it has satisfied the requirements of Rule 9(b) by identifying certain of the confidential witnesses as employees of BOA National or Clayton and specifying the time period of their employment.  As an initial matter, this is true only of a few allegations regarding LTV ratios, and even then, VNB has not, with the exception noted above, provided similar identifying information regarding the confidential sources underlying the allegations regarding adherence to underwriting guidelines in paragraph 87.  More importantly, VNB does not contend that it has spoken with the confidential witnesses it

---

[6] Allowing parties to rely on confidential witness statements drawn from another complaint also has the potential to incentivize collusion, and raises the possibility of complaints that are stocked with fabricated confidential witness statements placed in other complaints.

quotes, nor that it knows their identities or has taken any steps to authenticate their statements.

VNB also suggests that reliance on confidential witnesses quoted in another complaint is impermissible only where the allegations at issue are "uncorroborated." VNB argues that its allegations regarding the ratings downgrades and default rates provide sufficient corroboration for its complaint as a whole, and that it has made a "reasonable inquiry into its claims and the facts supporting them." As will be shown, however, the FAC contains precious little corroboration for VNB's scienter allegations. The FAC's other allegations also cannot absolve counsel of the obligation to ensure that "the factual contentions have evidentiary support." Fed. R. Civ. P. 11(b).

Whatever the strength of VNB's factual pleadings with regard to underwriting guidelines generally, there is a dearth of factual support for its allegations of scienter. In arguing that its FAC has sufficiently alleged scienter with regard to underwriting guidelines, VNB points to the material in paragraph 87 of the FAC, which is taken from AIG's confidential witnesses. The FAC discloses that the allegations came from the AIG complaint, but as discussed above, with one limited exception makes no mention of any confidential witnesses. As a result, the statements in paragraph 87 become essentially conclusory assertions untethered to any factual support. Conclusory

assertions fail to provide "strong circumstantial evidence of conscious misbehavior or recklessness." Lerner, 459 F.3d at 291.

VNB's allegations regarding Clayton's "trending reports" do suggest that BOA was at least negligent in waiving into securitization trusts 27% of the loans Clayton found "defective" without performing "proper consideration and analysis of compensating factors."[7]  Nevertheless, this fact alone, which does not after all address the particular securitization, much less the Supporting Loan Group, at issue here, does not by itself constitute strong circumstantial evidence of conscious misbehavior or recklessness.

A comparison with the scienter allegations in FHFA v. JPMorgan Chase is instructive.  In that case, the Court found adequate FHFA's allegations of fraudulent intent with respect to underwriting guidelines but dismissed as inadequate FHFA's allegations with respect to owner occupancy rates and LTV ratios.  902 F. Supp. 2d 476, 491–92 (S.D.N.Y. 2012).  In support of the allegation that BOA acted with fraudulent intent regarding underwriting guidelines, FHFA presented statements from witnesses at Chase Home Finance ("CHF"), one of the

---

[7] Indeed, these paragraphs of VNB's complaint were copied nearly verbatim from FHFA's complaint (which did not contain a fraud claim), with one telling exception: VNB removed FHFA's allegation that BOA had been "negligent" and added a reference to "fraudulent practices."

originators at issue in the case.  To take but two examples,
FHFA alleged that CHF loan officers were told that, if their
underwriting software rejected a loan, they should "try
resubmitting with slightly higher income.  Inch it up $500 to
see if you can get the findings you want."  Id. at 492.  FHFA
also presented a statement made by James Theckston, a former CHF
vice president, to the New York Times:  "The bigwigs of the
corporation knew," Theckston said, about declining lending
standards, "but they figured we're going to make billions out of
it, so who cares?"  Id. at 493.  VNB's FAC contains no
equivalent factual material in support of its allegations of
scienter.  The overall weakness of VNB's scienter allegations
requires dismissal of its claim regarding adherence to
underwriting guidelines.

      b.  Owner occupancy rates

    The FAC alleges that the offering documents materially
misstated the owner occupancy status of the mortgages in the
Supporting Loan Group.  The Prospectus Supplement indicates that
of the 367 loans in the SLG, 341 were for a "primary residence"
and 26 were for a "second home."  The FAC cites FHFA's forensic
review of a sample of loans in two securitizations at issue in
FHFA v. Bank of America, OOMLT 2007-6 and OOMLT 2007-FXD1, which
had BOA Securities as their co-lead underwriter.  Both of those
securitizations involved loans originated by Option One (not BOA

National, the originator of the loans at issue here).  The FAC
nevertheless alleges that

> it is reasonable to infer that because Defendants
> securitized and sold certificates in the BOAA 2006-1
> deal in the same manner as they did so [sic] with
> OOMLT 2007-6 and OOMLT 2007-FXDI, Defendants also
> materially understated the proportion of loans secured
> by non-owner occupied properties in BOAA 2006-1 4CB1.

The FAC provides no other factual support for this assertion.

These allegations fall far short of adequately alleging
falsity with respect to owner occupancy rates.  As the FAC
itself acknowledges, the analyses performed by FHFA were for
different securitizations and involved loans from different
originators.  Neither the FAC nor FHFA's analysis provides a
basis to assume that all loans backing securitizations
underwritten (or co-underwritten) by BOA Securities contained
false statements regarding owner occupancy status.  The FAC also
does not include any factual allegations regarding the accuracy
of owner occupancy rates reported by BOA National, the
originator of the loans in the SLG.  Without any factual
allegations regarding the particular SLG, securitization, or
even originator at issue, the FAC fails to pass muster.  See
ATSI, 493 F.3d at 99.

Nor has VNB adequately pleaded scienter with regard to
owner occupancy statements.  Assuming that it is indeed true
that these figures were materially misstated, nothing in the FAC

supports the inference that defendants knew this information was false. FHFA's complaint against JPMorgan, which the Court held did not adequately plead scienter with regard to owner occupancy rates, contained far more circumstantial evidence than VNB's FAC. FHFA was able to argue, for instance, that "the degree to which this information is erroneous is itself suggestive that the defendants knew or should have known that the representations in the Offering Documents were false." FHFA v. JPMorgan, 902 F. Supp. 2d at 491. VNB's FAC contains no allegations about the degree to which the owner occupancy representations in the Offering Documents were false, and therefore does not even provide that circumstantial evidence of fraudulent intent.

Finally, VNB speculates in a footnote of its opposition brief that BOA must have learned that the properties were not owner-occupied during the appraisal process. In making this argument it relies on a portion of the FAC addressed to LTV ratios. In any event, this purported breakdown in a process may describe negligent operations, but it is insufficient to plead fraudulent intent.

c. LTV ratios

The FAC also alleges that the offering documents misrepresented LTV ratios for the loans in the SLG. According to the FAC, the Prospectus Supplement reported that 93% of the

loans in the SLG had an LTV ratio of less than or equal to 80%, and only .44% had an LTV ratio greater than 100%. For factual support for its assertion that these figures were false, the FAC again turns to FHFA's forensic review. FHFA, the FAC alleges, used an automated valuation model ("AVM") to check the appraised values of the properties at issue. The AVM demonstrated that the value of the properties was significantly overstated at the time the mortgages were originated, meaning that the LTV ratios were significantly understated.

The FAC also cites more generalized evidence of problems with LTV ratios. The FAC first quotes from the Financial Crisis Inquiry Commission's The Financial Crisis Inquiry Report (2011) ("FCIC Report"), which reported, without mentioning BOA in particular, that "inflated appraisals" were a pervasive problem during the relevant time period. The FAC also cites a handful of statements by unnamed witnesses, again taken from the AIG complaint: a former employee of BOA National reported that some loan officers at the company succeeded in inducing appraisers to inflate their valuations, and a former Clayton employee reported that a Vice President at BOA National told him he "didn't give a flying f*** about DTI" and other credit characteristics of the loans. The FAC also alleges that in one instance BOA National had a Clayton employee who was identifying inflated appraisals fired.

25

With regard to LTV ratios, the FAC does adequately allege falsity.  The observations in the FCIC Report about inflated appraisals have little weight since it does not identify BOA National as one of the institutions experiencing this problem. But the FAC also relies on the FHFA forensic review.  Defendants observe that FHFA's forensic loan file review dealt with loans from a different Supporting Loan Group, as FHFA purchased a different class of certificates than those purchased by VNB. Nevertheless, the analysis sheds light on the accuracy of the LTV representations as to a set of loans from the same originator in the very same securitization.  Plaintiffs are not required as a general rule to support a complaint with granular review of loan files from the particular Supporting Loan Group underlying the certificates at issue.  See FHFA v. UBS Americas, Inc., 858 F. Supp. 2d 306, 332 (S.D.N.Y. 2012); FHFA v. JPMorgan Chase, 902 F. Supp. 2d at 489-90.  After all, as the Court has observed, a contrary holding "might constitute an insurmountable barrier for any private plaintiff," as "FHFA was apparently able to obtain the loan files it reviewed at least in part through recourse to administrative subpoenas."  FHFA v. JPMorgan Chase, 902 F. Supp. 2d at 489-90.  The material in the FAC from FHFA's review is sufficiently analogous to constitute factual support for VNB's claim regarding LTV ratios in this case.

26

As with adherence to underwriting guidelines and owner occupancy rates, however, the FAC fails to adequately allege scienter with regard to LTV ratios.  The two paragraphs of the FAC that contain scienter allegations regarding LTV ratios are again based on confidential witnesses quoted the <u>AIG</u> complaint, although this time VNB omits any reference to the <u>AIG</u> complaint but identifies the sources of the allegations as former employees at Clayton and BOA National.  As noted above, this is improper.[8]  Moreover, the second paragraph that alleges scienter appears to be largely irrelevant to LTV ratios.  The colorful language quoted above alleges that BOA National was indifferent to "DTI," which is the debt-to-income ratio for a given loan. The appraisal value of the underlying property is not a factor in determining DTI.  <u>See Assured Guar. Mun. Corp. v. Flagstar Bank, FSB</u>, 920 F. Supp. 2d 475, 481 (S.D.N.Y. 2013).  While the FAC goes on to allege that the same BOA National employee didn't care about "other credit characteristics of the loans," it does not explain what "credit characteristics" means in this context, nor does it allege that this term includes appraisals or LTV ratios.

---

[8] The FAC does not explicitly attribute the statement quoted above that BOA National "went so far as to get a Clayton employee fired that was identifying inflated appraisals" to a confidential witness, but a review of the <u>AIG</u> complaint reveals that this allegation too comes from a confidential source.

As a result, the core allegation to support an inference of fraudulent intent regarding LTV ratios is the statement of a former BOA National employee that it was "common knowledge" that "some" loan officers were close to appraisers and allowed inflated appraisals.  The former employee also reported that a loan officer would "often" request a specific valuation to permit loans to be approved.  Even if it were appropriate to rely on these descriptions of behavior by some loan officers at BOA National -- and it is not, for all the reasons described above -- they do not create a sufficiently strong inference of fraudulent intent with respect to the LTV ratios in the single securitization at issue here.  A widespread understanding within an organization that some of its employees were performing badly or even improperly is insufficient to tar the organization with fraudulent intent across its entire business.  Even where confirmed with the allegations regarding the FHFA forensic review, they fail to plead fraud.

Moreover, the Rule 11 concerns discussed above are heightened here, where VNB has stripped from the FAC any mention of the AIG complaint, while preserving the attribution of the statements to confidential witnesses.  This creates the apparently erroneous impression that counsel for VNB has actually spoken with these witnesses and can affirm that they did in fact make the statements attributed to them.

28

                    d.  Credit Ratings

     Finally, VNB alleges that defendants "inflated" the credit
ratings that were assigned to the certificates by the rating
agencies.  In advancing credit ratings as a distinct category of
misrepresentation, VNB's claim is not that the defendants
actually misstated the ratings that had been assigned to the
certificates (i.e., reporting in the offering documents that the
certificates had been assigned a AAA rating when in fact they
had not).  VNB also does not allege that the ratings agencies
themselves did not believe the ratings they assigned, in the
manner of the appraisers discussed above.  Rather, VNB's claim
is that the ratings were necessarily based on the
characteristics of the loans in the SLG, like adherence to
underwriting guidelines, owner occupancy rates, and LTV ratios,
which were reported to the ratings agencies by the defendants.
Thus, by reporting false information to the ratings agencies,
defendants were able to obtain inflated ratings, which were
false in the sense that they did not reflect the true
characteristics of the underlying collateral.

     The ratings may constitute actionable misstatements under
New York law even if characterized as "opinions" if they were
not subjectively believed or if they were based on factual
misrepresentations.  See 60A N.Y. Jur. 2d Fraud and Deceit § 37
("A statement that is in form an opinion . . . may give rise to

                              29

a claim of fraud where it imports that the speaker knows that facts exist that support his or her conclusion and . . . does not know of the existence of facts that, if known, would cast doubt upon it."); see also Polish & Slavic Fed. Credit Union v. Saar, 963 N.Y.S.2d 556, 560 (Sup. Ct. 2013) ("[A]n assessment of market value that is based upon misrepresentations concerning existing facts may support a cause of action for fraud."). Indeed, one New York court recently denied a motion to dismiss in a fraud action based in part on an allegation that the credit ratings assigned to a CDO "were false because the Defendants provided false information to the ratings agencies." M&T Bank. Corp. v. Gemstone CDO VII, Ltd., 881 N.Y.S.2d 364, 2009 WL 921381 at *11 (Sup. Ct. 2009), aff'd as modified, 891 N.Y.S.2d 578 (App. Div. 2009). The court disagreed with the contention that the ratings were "all opinions and/or predictions and . . . therefore not actionable," holding instead that they were "facts constituting the actual evaluation by reputable independent entities concerning the creditworthiness of the Notes." Id.

Nevertheless, to allege that the credit ratings were fraudulent the FAC must adequately allege the underlying false statements and fraudulent intent in conveying the false information to the ratings agencies. In other words, VNB's fraud claim as to the credit ratings fails, because it has not adequately alleged the three underlying categories of fraud.

See FHFA v. Merrill Lynch & Co., et al., 903 F. Supp. 2d 274,
278 n.4 (S.D.N.Y. 2012).

III.  Aiding and Abetting

Even if VNB had stated a claim for fraud, VNB's claim
against BOA Corp. would be dismissed.  While the FAC asserts a
single claim for common law fraud, its only allegation as to BOA
Corp. is that it aided and abetted the fraud committed by its
wholly owned subsidiaries.  More specifically, the FAC alleges
that BOA National, BOA Securities, and BOA Mortgage are owned
directly or indirectly by BOA Corp., and that BOA Corp. controls
and sets policy for them.  The FAC also alleges that BOA Corp.
is "involved in repurchase claims and settlements for such
claims" and has the "power to set the ethical policies of all
its direct and indirect subsidiaries."

To establish liability for aiding and abetting fraud under
New York law, a plaintiff must show "(1) the existence of a
fraud; (2) the defendant's knowledge of the fraud; and (3) that
the defendant provided substantial assistance to advance the
fraud's commission."  Lerner, 459 F.3d at 292 (citation
omitted).  The knowledge that must be established is actual
knowledge, which under Rule 9(b) must be pled with
particularity.  Id. at 292-93.

As discussed above, the FAC does not adequately allege the
underlying fraud, nor does it allege that BOA Corp. either had

actual knowledge of the underlying fraud or provided substantial assistance to advance its commission.  Indeed, the FAC alleges only that BOA Corp. owns the other defendants and "controls" them in purely general terms.  There is no mention whatsoever of any involvement by BOA Corp. in the securitization process or in the sale of the certificates.  VNB's aiding and abetting claim must therefore be dismissed.[9]

CONCLUSION

Defendants' January 18 motion to strike is denied, while its motion to dismiss is granted in its entirety.

SO ORDERED:

Dated:     New York, New York
           September 16, 2013

_____
DENISE COTE
United States District Judge

---

[9] Because the motion to dismiss is granted, it is not necessary to address defendants' motion to strike VNB's punitive damages claim.

32